# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| **BUNNETT & CO., INC., et al.** | § | |
| | § | |
| **V.** | § | **A-15-CV-1104 -LY-AWA** |
| | § | |
| **FRANK DORES** | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

TO:  THE HONORABLE LEE YEAKEL
     UNITED STATES DISTRICT JUDGE

Before the Court are Plaintiffs' Amended Motion for Order to Show Cause (Dkt. No. 179),

Plaintiffs' Brief in Support (Dkt. No. 205), Todd Gearheart's Response (Dkt. No. 209), Ray

Gearheart's Response (Dkt. No. 210), and Plaintiffs' Reply (Dkt. No. 213); and Joint Motion to

Dismiss Voluntarily with Prejudice Movants' Claims Against Respondent Wawasan (Dkt. No. 190).[1]

The District Court referred the above-motions to the undersigned Magistrate Judge for report and

recommendation pursuant to 28 U.S.C. § 636(b)(1)(A), FED. R. CIV. P. 72, and Rule 1(c) of

Appendix C of the Local Rules.

## I. FACTS

### A.     Procedural History

In this suit, Plaintiffs Bunnett & Co., Inc. (Bunnett) and Energy Feeds International, LLC

(EFI) accuse Frank Dores of breach of fiduciary duty and theft of trade secrets.  The suit was

---

[1]Plaintiffs and Respondents Wawasan and Gareth Cheong filed the Joint Motion to Dismiss Voluntarily on the basis that they have reached a settlement agreement.  As discussed at the evidentiary hearing, the Court **RECOMMENDS** that the District Court **GRANT** the Joint Motion to Dismiss Voluntarily with Prejudice (Dkt. No. 190).  The Court further **RECOMMENDS** that the District Court **DENY** Plaintiffs' Amended Motion for Order to Show Cause with regard to alleged contemnors Wawasan Agrolipids and Gareth Cheong.

originally filed in state court, and shortly thereafter was removed to federal court. Though not directly relevant to the claims asserted here, a short description of the alleged dealings between Bunnett and Dores provides helpful background to the issues before the Court.

Bunnett and EFI are in the business of distributing animal feed supplements for dairy cattle. One of Bunnett and EFI's main suppliers was Wawasan Agrolipids, Inc., a Malaysian company owned by Gareth Cheong. Dores began working for EFI in November 2008, and eventually became General Manager of both companies. In his positions with EFI and Bunnett, Dores built relationships with suppliers and customers, including Wawasan. In October 2015, Dores abruptly resigned his positions, claiming that he was experiencing severe emotional distress that made it impossible to continue performing his duties. He filed a workers' compensation claim and filed for disability benefits. However, at the same time, Dores incorporated a new entity that Plaintiffs assert he intended to use to compete against Bunnett and EFI by using trade secrets Dores had misappropriated from them—namely information on customers and suppliers, delivery capabilities, shipping speed, stock of product, and prices.

As a result, Bunnett filed suit in state court, and on the same day requested a temporary restraining order which the state court granted on November 24, 2015 (November TRO). The court further set a preliminary injunction hearing for two weeks later. Shortly before that hearing was to take place, however, Dores removed the case to federal court. After removal, Bunnett filed a motion in this Court requesting a TRO, and the Court set it for a hearing on January 13, 2016. After the hearing, the parties reached an agreement, and submitted an agreed TRO to Judge Yeakel. That TRO was signed and entered on January 13, 2016 (January TRO). Dkt. No. 47. It reads, in relevant part:

IT IS ORDERED that Defendant Frank Dores and any persons in active concert or participation with Dores who receive actual notice of this Order are commanded forthwith to refrain from: . . . Directly or indirectly soliciting, either on behalf of himself or any other person, employer, or entity, for the purpose of creating a contractual or other business relationship any customer or supplier of Plaintiffs with whom Dores had contact or for whom he performed services during his employment with Plaintiffs.

*Id.* at 1. The January TRO further sets forth Dores' required response were he to be contacted by a former customer or supplier. *Id.* The January TRO was served on Gareth Cheong and Wawasan and Ray Gearheart, a former independent contractor/sales person for Bunnett.[2] Pl. Exh. 60. R. Gearheart sent Todd Gearheart an email with the November TRO attached, to which T. Gearheart responded, "And so it begins." Pl. Exh. 50. On January 22, 2016, while the January TRO was in force, Bunnett moved for a preliminary injunction. Dkt. No. 51. Three days later, Dores filed his Suggestion of Bankruptcy, notifying the Court that he had filed a voluntary petition in the Eastern District of California, thereby staying the case. Dkt. No. 52. The January TRO expired by its own terms on February 1, 2016.

In September 2016, while the case was still under the automatic stay, Bunnett filed a motion for Order to Show Cause (Dkt. No. 65) alleging that several non-parties had violated the TRO issued by this Court. Dkt. No. 65. In this motion, Bunnett claimed that Wawasan, its Executive Director Gareth Cheong, T. Gearheart and his company E&K Ag, R. Gearheart and his company Gearheart Ag, and John Franklin all participated in a scheme in which Wawasan—with the help of the others and several of Dores's family members—sent two $20,000 payments to Dores in violation of the TRO. At a status conference on the motion, the Court first ordered briefing to address jurisdictional

_____

[2]Two of the parties named in the present motion are father and son, Ray and Todd Gearheart. The Court will differentiate between them by using their first initial along with their surname.

issues raised by several of the alleged contemnors. With the exception of Franklin, the Court found that it had jurisdiction over the alleged contemnors. Dkt. Nos. 109 & 114. The Court then set a schedule for discovery and a hearing on the merits of the motion. Shortly before the evidentiary hearing, Dores' bankruptcy suit was dismissed, thus lifting the automatic stay on this Court. Bunnett then moved to amend its Motion for Order to Show Cause to add Dores as a Contemnor. The Court granted this motion, and Dores was added as a party. His counsel sought leave to withdraw, which was granted, and Dores has been representing himself since then.[3] Finally, just days before the hearing was set to begin, Bunnett, Wawasan, and Cheong reached an agreement on the motion, and filed their joint motion to dismiss voluntarily. Dkt. No. 190.

## B.    The Evidentiary Hearing

The Court held a two-day evidentiary hearing on the Motion for Order to Show Cause on July 24-25, 2017. At this hearing the Court heard evidence on the issue of whether the two $20,000 payments made to Dores violated the January TRO. A number of witnesses testified via deposition. Set forth below are the factual findings of this Court.

### 1.    Factual Findings[4]

Dores had worked at EFI and Bunnett for about 7 years before leaving. When he left in October 2015, Dores claimed that he was suffering from severe stress, and requested workers' compensation forms. Pl. Exh. 18; Pl. Exh. 19 (R. Gearheart email stating that Dores' attorney "had him put in a claim on workmens [sic] comp to solidify his claim of stress" to which T. Gearheart

---

[3]Dores did not file any post hearing briefing.

[4]The Court sets out its findings and conclusions in narrative form. To the extent that any finding of fact is more appropriately considered a conclusion of law, or vice verse, then such findings or conclusions are deemed as such.

responded "Wow that is just wrong in so many ways"). Further, Cheong testified that at this same time, Dores asked to be taken on as General Manager at Wawasan, at a salary of $20,000 per month. Cheong Dep. 41:23–42:20. Cheong declined to hire him, stating that Wawasan did not have the internal structure to accommodate such a position. *Id.* Documents also show that in October Dores incorporated FM Ag Enterprises, Inc (FM Ag). Vol. 1 Tr. 97:11–98:20. Dores claimed that this was a husband-wife venture and was incorporated for his wife's real estate appraisal business. *Id.* 99:2–5. However, the corporate documents listed Dores as CEO with a salary of $120,000, while his wife was Treasurer/Secretary and received no salary. *Id.* 98:13–14, 101:2–16. It further appears that in at least one email at the time, he referred to FM Ag as "his" business. *Id.* 101:17–24, 102:7–24; Pl. Exh. 44. Moreover, FM Ag, on November 17, 2015 received a payment from Wawasan, allegedly for a report drafted by Dores' wife. Vol. 1 Tr. 107:1–3; Pl. Exh. 41. However, each of the parties has admitted that no report was ever done. *See* Wei Su 11/1/16 Dep. 69:24–70:07; Cheong Dep. 92:09–22; *cf.* Vol 1 Tr. 107:9–15 (Dores stating that Wawasan sent the payment to "keep [him] out of the business").

Shortly before Dores left, Bunnett and Wawasan had a dispute that led to Wawasan stopping shipments to Bunnett.[5] RG Exhs. 9–11. This led to Bunnett having difficulty filling its customers' orders. Also, a new Wawasan distributor appeared on the market at this time—Agrofin—which was offering to distribute Wawasan products to United States purchasers, the business Bunnett had been engaged in. Wei Su. 6/27/17 Dep. 23:16–19. At around the same time, R. Gearheart and another independent contractor, John Franklin, who had been salesmen for Bunnett and EFI, also quit. Vol.

---

[5]The facts of this dispute, though touched on at the hearing, are immaterial to the instant case, and therefore will not be set forth here.

2 Tr. 84:14–22, 246:25–247:5.  After leaving, both Franklin and R. Gearheart were introduced to Wei Su and were taken on as independent sales agents for Agrofin. Vol. 2 Tr. 84:23–84:7; Pl. Exhs. 28 & 30.  Wei Su first testified that she was introduced to Dores, R. Gearheart, and Franklin by Cheong, and that they were to be working for Agrofin as independent sales agents.  Wei Su 11/1/16 Dep. 38:21–39:09; Wei Su 6/27/17 Dep. 44:05-08; cf. Pl. Exh. 12 (showing R. Gearheart's invoices for $20,000 for services for Agrofin from December 2015 to June 2016).[6]  Emails between Wei Su and several of Bunnett's former customers show that during this period Dores introduced the customers to Wei Su to supply their product needs.    Pl. Exhs. 33, 35, 38–40; *see also* Wei Su 6/27/17 Dep. 91:02–09.  Though in her first deposition, Wei Su admitted that this was due to Dores being taken on as a sales agent (Wei Su 11/1/16 Dep. 38:16–24), she later claimed that she did not know why Dores was sending customers to Agrofin.  Wei Su 6/27/17 Dep. 54:22-25, 91:16–92:06.

A number of emails between January and March 2016 cast additional light on Dores' business activities during this period.  On January 5, 2016, R. Gearheart—who at this time was a sales agent for Agrofin—sent an email to KoreChem, Inc. representative Steven Schabel stating that he, Franklin, and Dores were working together to distribute products.  Pl. Exh. 54.  Similarly, on March 8-9, R. Gearheart and Cheong emailed each other about a plan to sell directly to dairies, in which Cheong noted that he had spoken with Dores on the topic.  Pl. Exh. 67; Cheong Dep. 36:16–37:16.  And on March 28, R. Gearheart and Cheong discussed the same plan, and stated that R. Gearheart should talk to Dores about it again.  Pl. Exh. 71.  When asked at the hearing about these

---

[6]R. Gearheart and Franklin were sales agents for Agrofin, though Cheong clarified that Wawasan paid them salaries as opposed to commissions.  Cheong Dep. 43:25–44:17.

communications, R. Gearheart flatly denied discussing any business matters with Dores. Vol. 2 Tr. 106:14–107:24, 108:10–23, 146:6–147:5, 147:14–25.

Cheong testified that in December 2016, Dores contacted him to request monetary assistance, and stated that he could not receive the money directly from Wawasan due to the lawsuit against him. Cheong Dep. 174:21–24, 175:08–13, 181:23–182:10, 183:09–17; Vol. 2 Tr. 134:3–5; Pl. Exh. 57. Thus, Cheong, together with R. Gearheart, began planning a way to send Dores $40,000. Cheong Dep. 159:16–19. The plan was for R. Gearheart to send checks to various of Dores' family members, and for these family members to pass the checks on to Dores. When R. Gearheart's wife refused to participate in the scheme, R. Gearheart then turned to his son, T. Gearheart, and asked him to pass the money through his accounts instead. Vol. 2 Tr. 203:5–204:1; Pl. Exh. 57. The plan then became that Wawasan would send $40,000 in January, divided into partial increments sent to Dores' family members. Cheong Dep. 161:24–162:04; Pl. Exhs 56 & 57.[7] The parties then decided that a transfer of $40,000 at one time would attract too much attention. Pl. Exh. 62. They therefore decided to send $20,000 in January, and $20,000 in March. Pl. Exhs. 11, 65, & 68. T. Gearheart sent Wawasan an invoice from E&K Ag for $40,000 on January 15, 2016, to which Wawasan provided a payment voucher for $20,000 on January 25, 2016. Pl. Exh. 64. Cheong then transferred $20,000 to T. Gearheart's personal account on January 26, 2016, and T. Gearheart sent a $15,000 check to Angel Hernandez, and a $5,000 check to Marcio Relva. Pl. Exh. 11. Then, on March 21, 2016, T. Gearheart sent an invoice to Wawasan for $20,000, "[b]eing payment for balance 50% of invoice 8551 dated 15 January 2016 for services rendered." Pl. Exh. 69. Wawasan sent the $20,000

---

[7]There was apparently some confusion with this plan because Cheong originally believed that T. Gearheart would make the payments out of E&K Ag's pockets, and then request reimbursement several months later. Cheong Dep. 161:10–22.

to T. Gearheart's personal account and a payment voucher on March 28, 2016. *Id.*; Pl. Exh. 11. Again, T. Gearheart distributed the payment in two checks for $10,000: one to JA Hernandez Construction and another to Teresa Miranda. Pl. Exh. 11.

## 2. Credibility Findings

Given the divergent testimony and evidence, the Court addresses the credibility of the witnesses separately. First, Dores was not credible.[8] On the one hand, he claimed to be too sick to engage in any business activities with Bunnett customers or suppliers. *See, e.g.*, Pl's Exh. 55 at 3 (stating, in Dores' answer to an interrogatory that he never provided an alternate provider to a former customer); Vol. 1 Tr. 79:25–80:3 (contending that he provided references for old customers, but never "assisted" Agrofin). But on the other hand, in several emails during this time he discussed prices for product, and introduced contacts to Agrofin. *See, e.g.*, Pl. Exhs. 33, 35, 38–40; *see also* Wei Su Dep. 6/27/17 91:02–09. Dores also claims a complete lack of memory regarding the entire basis of this contempt action—Wawasan's payments to him—that, frankly, is completely unbelievable. *See* Tr. at 137–38.

Similarly, Dores' comments regarding the incorporation of FM Ag are completely unworthy of belief. Dores claims that the business was incorporated for his wife's real estate appraisal business. Vol 1 Tr. 99:2–5. But the corporate documents show that Dores was identified as the CEO with a salary of $120,000, while his wife did not have a salary. The corporate name is extremely similar to other businesses in the feed supplement industry (*e.g.*, E&K Ag and Gearheart

---

[8]This is not the first time that the undersigned has found Dores' testimony to be problematic. In a hearing on January 13, 2016, the Court noted that many of Dores' statements looked "very much like perjury," and noted that it appeared Dores was "trying to commit a fraud on the Court." Dkt. No. 59 at 92.

Ag, the Gearhearts' businesses), and there is nothing about the name that suggests it is a real estate appraisal company. Moreover, Dores used the name FM Ag in an email to a potential feed supplement customer. *Id.* 101:2–24, 102:22–24. FM Ag was also the recipient of a payment from Wawasan in November of 2015. *Id.* 107:1–3. The FM Ag "invoice" to Wawasan supporting the payment indicated it was for a research report, though the parties admitted that this was a sham, as there was no research report ordered or completed. *See* Wei Su Dep. 11/1/16 69:24–70:07; Cheong Dep. 92:09–22. Finally, in the bankruptcy case Dores filed to stay this litigation, the court dismissed with prejudice Dores' bankruptcy petition for bad faith after Dores failed to disclose in his schedule of assets the two very same $20,000 payments that are at issue here. *See* Dkt. No. 150-2 at 28-29.

R. and T. Gearheart's testimony similarly lacked credibility. For example, R. Gearheart testified that he "never worked with Frank Dores at any time after he left [Bunnett]." Vol. 2 Tr. 104:07–11. Yet, in an email on January 5, 2016, sent to a representative at KoreChem, Inc., R. Gearheart stated that he was working with both John Franklin and Dores in selling feed supplements. Pl. Exh. 54. When confronted with this email at the hearing, R. Gearheart's response was to contend that he was lying in the email, not in his testimony. Vol. 2 Tr. 106:14–107:24, 108:10–23. Similarly, R. Gearheart testified that Cheong had expressed concern that the payments would be seen as a "pay-off" and that he knew Cheong wanted not to attract attention to the payments. *Id.* 13:11–18, 165:13–17. Notwithstanding the steps that were being taken to hide the payments, R. Gearheart also testified that he never considered that the payments were in any way related to the January TRO. *Id.* 165:18–24; *see also id.* 2 221:25–222:10 (stating that it never occurred to him that Wawasan was paying Dores for services). T. Gearheart's testimony was similarly inconsistent. First, in his interrogatory answers—which he never amended—he completely denied knowledge of the

November TRO. *See id.* 21:12–22:15; Pl. Exh. 76. However, the evidence demonstrated that his father sent him the November TRO in an email. *Id.* 22:6–24:4; Pl. Exh. 50. He also repeatedly denied knowledge of the January TRO. Vol. 2 Tr. 18:1–4, 18:18–25, 25:5–11. Yet, his interrogatory answer states that he was aware in January 2016 that Dores had an injunction against him. *Id.* 18:3–11. Moreover, in his deposition, T. Gearheart acknowledged that he knew the payments were being made to Dores because "he had an injunction against him and he couldn't work." *Id.* 2 27:22–24 .

Gareth Cheong and Wei Su's testimony is also filled with inconsistencies. In the most obvious example, Wei Su provided two different answers to a nearly identical question asked of her in both her June 2017 and November 2016 depositions. In the first, she admitted that Dores was supposed to be paid as an independent sales agent (Wei Su 11/1/16 Dep. 38:16–24), but in her June 2017 deposition, when confronted with emails from Dores to former Bunnett customers, she claimed that she did not know why Dores was contacting these companies on Agrofin's behalf (Wei Su 6/27/17 Dep. 54:22-25) and flatly denied that he was a sales agent for Agrofin (*Id.* 91:16–92:06). Cheong's inconsistencies run along this same line. For example, he claimed that the payment in November 2015 was made for the purpose of keeping Dores from going to work for Wawasan's competitors. Cheong Dep. 56:20–58:01, 58:22–59:02. However, just two months later, Cheong contends that "the scenario ha[d] changed" and he was no longer concerned that Dores would go to work for a competitor. *Id.* 195:21–196:04.

As a result of all of these inconsistencies, the Court finds that the testimony from Dores, R. and T. Gearheart, Cheong and Wei Su was in large part not credible.

## II. ANALYSIS

A court "possess[es] the inherent authority to enforce [its] own injunctive decrees." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995). "A party commits contempt when he violates a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Travelhost*,68 F.3d at 958 (quoting *Securities & Exchange Comm. v. First Fin. Grp. of Tex.*, 659 F.2d 660, 669 (5th Cir. 1981)). A court's order "binds not only the parties subject thereto, but also non-parties who act with the enjoined party." *Travelhost*,68 F.3d at 958; *see also Waffenschmidt v. MacKay*, 763 F.2d 711, 726 (5th Cir. 1985) ("[A]ny party who knowingly aids, abets, or conspires with another to evade an injunction or order of a court is also in contempt of that court.").

A party moving for civil contempt must show "1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." *Whitcraft v. Brown*, 570 F.3d 268, 271 (5th Cir. 2009) (quoting *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992)). Moreover, the alleged contemnor must "receive actual notice" of the order. FED. R. CIV. P. 65(d)(2); *see also Waffenschmidt*, 763 F.2d at 714. The moving party bears the burden of proving contempt by clear and convincing evidence. *Travelhost*,68 F.3d at 958 (citing *Petroleos Mexicanos v. Crawford Ents., Inc.*, 826 F.2d 392, 401 (5th Cir. 1987)). Clear and convincing evidence is "higher than the 'preponderance of the evidence standard' . . . but not as high as 'beyond a reasonable doubt.'" *Travelhost*,68 F.3d at 958 (citing *United States v. Rizzo*, 539 F.2d 458, 465 (5th Cir. 1976)). The Fifth Circuit has defined this standard in the contempt context to mean:

that weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts of the case.

*Travelhost*, 68 F.3d at 958  (quoting *In re Medrano*, 956 F.2d 101, 102 (5th Cir. 1992)).

## A.    Notice

To hold a non-party in civil contempt, the person must have actual notice of the court's order. FED. R. CIV. P. 65(d)(2).  Both Dores and R. Gearheart were served with the January TRO, and therefore received actual notice of it.  *See e.g.*, Pl.'s Exh. 60 (mail receipt to R. Gearheart).  T. Gearheart was not formally served with the January TRO, and therefore argues that he did not have actual notice of it and cannot be held in contempt.  He relies on *Whitcraft* in support of his argument. Dkt. No. 209 at 21. In that case, the court found that there was no evidence that the alleged contemnor, the mother of the defendant, was "aware of the specifics of the freeze order or knew that the freeze order applied to assets which were not owned" by the defendant.  *Whitcraft*, 570 F.3d at 273 n.6.  Thus, the court held that she could not be held in contempt when she was not "aware of the . . . specific terms of the order."  *Id.* at 273.  T. Gearheart argues that he was not served with the January TRO, nor was he aware of the specific terms of the order.  Rather, he was merely aware that "Dores had an injunction against him preventing him from working in the 'ag industry.'"  Vol. 2 Tr. 17:3–11.  Throughout the hearing, T. Gearheart continued to assert that he "did not receive a copy of the January TRO, [he] did not talk to [his] father about it, [he] did not know about it, and [he] was not served with it."  *Id.* 18:15–17.

While "actual notice" is required to hold a person in contempt for violation of a court's order, "[p]laintiffs are not required to adduce direct evidence that [the contemnor] had actual notice of the

court's orders," because "[s]uch proof is often unavailable." *Waffenschmidt v. MacKay*, 763 F.2d 711, 725 (5th Cir. 1985) (citation omitted). Though T. Gearheart did not receive a formal mailing or "service" of the January TRO, there is nevertheless sufficient evidence showing, clearly and convincingly, that he had knowledge of the Court's order, what it required, and that he assisted Dores in violating it. First, T. Gearheart admitted that he was aware that Dores was under an injunction not to work in the agriculture industry. *See* Vol. 2 Tr. 17:3–11; *see also Waffenschmidt*, 763 F.2d at 725 (looking to, among other things, the fact that "Johnson admitted that before he cashed the T-Note, MacKay had told him that he was 'under a lawsuit'"). He had received the November TRO in an email sent by his father. Pl. Exh.50. Though he states that he never read the November TRO, this is not credible, as he admits that he was aware that Dores was under an injunction requiring that he refrain from working in the industry.

The conclusion that T. Gearheart was aware of the January TRO is further supported by his many inconsistent sworn statements on this issue. First, in his interrogatory answers he denied knowledge of both the November and January TROs, despite the fact that he later admitted to being aware to some extent of the November TRO, and that his father emailed it to him . *See* Pl. Exh. 76 (Response Nos. 1 and 4). T. Gearheart contended that he never read the November TRO, yet, without having read the email from his father, it is difficult to see how he could then, in January, know that Dores was under an injunction. *See also* Vol. 2 Tr. 29:6–12 (admitting that he knew Dores "was under an injunction"). Moreover, on cross examination, T. Gearheart testified that he knew about the November TRO. *See* id. 18:7–9 ("The only TRO I knew about, that I got a copy that Ray forwarded to me, was from November of 2015, which in turn I sent that to my employer."); Pl. Exh. 50 (showing an email chain between R. and T. Gearheart discussing the litigation and attaching

the November TRO). T. Gearheart's equivocal testimony on this issue is evidence of his untruthfulness regarding the state of his knowledge.

Perhaps the strongest evidence that T. Gearheart was aware of the TRO is the lengths to which he went to shelter the fact that the payments he was facilitating were coming from Wawasan, and going to Dores. In emails his father sent to him, his father made numerous statements making it clear that they were actively working to transfer the money to Dores in a hidden, indirect manner. In one exchange, R. Gearheart tells his son "The bad part of that Is [sic] Bunnetts lawers [sic] are watching that company like hawks , you may want to send out 2-3 checks to different people that will then loan Frank the money," to which T. Gearheart replied: "Wow ok. I sure hope this doesn't come back somehow." Pl. Exh. 57. In another, T. Gearheart noted, with reference to providing a check, "This could bring undue attention that would require a considerable amount of explanation." Pl. Exh. 62. And when he sent the fake invoice for $40,000, he wrote "For your records in case this was ever to blow up I would write on check 'product research." *Id.* Indeed, the very creation of the fake invoice evidences T. Gearheart's knowledge and intent. He admitted that he wrote and sent a fake invoice to Cheong for $40,000 on January 15, 2016. *See* Pl. Exh. 61 (attaching an invoice and asking "Does this work?"); Vol. 1 Tr. 205:19–206:14 (admitting that E&K Ag never participated in a research study for Wawasan, and that the invoice numbering system was created solely for this invoice); Cheong Dep. 192:16–193:2. He also admitted that Wawasan was sending him the payments in order to conceal that they were the actual source of the funds:

> Q. Are you – are you disputing now your awareness that Gareth Cheong wanted your help to conceal these payments?
>
> A. That's what I was told.

14

* * *

Q. But, I mean, certainly you knew, based on what your —or it was your understanding based on what your father told you that Gareth wanted your help to conceal the payments, right? . . .

A. Yeah.

Vol. 2 Tr. 33:23–25; 34:12-17; *see also* Cheong Dep. 183:09–17. Together with the other evidence already discussed, T. Gearheart's knowing participation in sham transactions to hide the source of the funds being delivered to Dores, provide clear and convincing evidence that he had notice of the terms of the January TRO. *See Waffenschmidt*, 763 F.2d at 725–26 ("Proof of Johnson's activities in relation to his disposition of the funds, plus his demeanor at trial provided sufficient evidence of his knowledge and intent to meet plaintiffs' burden.").

**B. Violation of the January TRO**

As noted earlier, to prove a contempt of a court order, the movant must show: (1) that there a court order was in effect, (2) that the order required the enjoined party to refrain from specific conduct; and (3) that the enjoined party failed to comply with the order. *Whitcraft*, 570 F.3d at 271. Further, when someone other than the enjoined party is charged with contempt of an injunction, the movant must show that the party had actual notice of the court's order and worked in active concert or participation with the enjoined party in violating the order. *Waffenschmidt*, 763 F.2d at 726. In the following sections, the Court breaks these elements into their constituent parts and examines the evidence as to each.

**1. Court Order in Effect**

First, there is no dispute that there was a court order in effect during the relevant time. The TRO was in effect from January 13, 2016 to February 1, 2016. Thus, the first element is satisfied.

## 2. Conduct Enjoined by the January TRO

With regard to the conduct being enjoined by the TRO, the parties offer competing constructions of the order to support their positions. While the Gearhearts offer a narrow interpretation of the TRO, Bunnett argues that the Contemnors violated the clear terms of the TRO, and, alternatively, that even if the exact terms of the TRO did not prohibit the exact conduct at issue, the payments violated the "reasonably understood" terms of the order.

To arrive at their extremely narrow interpretation of the TRO, the Gearhearts separately define each phrase of the document. First, R. Gearheart notes that the TRO only prohibited Dores from soliciting "any customer or supplier" of Bunnett, and contends therefore that the TRO did not prohibit him from soliciting *former* customers or suppliers. In support of this reading, R. Gearheart supplies several cases in which the TRO specifically refers to former vendors. *See* Dkt. No. 210 at 22-23. From this he argues the TRO cannot apply to any relationship between Dores and Wawasan because at the time of the TRO, Wawasan was not a supplier of Bunnett. He next notes that the TRO prohibited Dores from soliciting customers or suppliers "for the purpose of creating a contractual or other business relationship," and argues that the phrase "other business relationship" should be read to require something analogous to the creation of a business organization, such as a partnership, limited liability company, or corporation. This, he argues, would allow simple business discussions or plans so long as Dores did "not solicit to create the duty-bound relationships that arise from partnerships, companies and corporations," and thus would not apply to Wawasan's employment of Dores. Dkt. No. 210 at 27. Finally, both R. and T. Gearheart argue that the term "creating" in this phrase should not be read to include "maintaining" or "performing" an existing relationship, so that the TRO would only prohibit beginning a new relationship during the term of the TRO. *Id.* at 27-28;

Dkt. No. 209 at 28.  Because Dores already had a relationship with Wawasan that began in November 2015, under this construction the payments made in January and March would not be prohibited.

This reading of the TRO is strained, to put it mildly.  It is true, "the contempt power should only be invoked where a specific aspect of the injunction has been clearly violated." *Piggly Wiggly Clarksville, Inc.v. Mrs. Baird's Bakeries*, 177 F.3d 380, 383 (5th Cir. 1999).  And an injunction "must 'state its terms specifically; and describe in reasonable detail . . . the act or acts restrained or required.'"  *Hornbeck Offshore Servs., LLC v. Salazar*, 713 F.3d 787, 792 (5th Cir. 2013).  But, "[t]hough a court order must be clear, a court 'need not anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated," and "a district court is entitled to a degree of flexibility in vindicating its authority against actions that, while not expressly prohibited, nonetheless violate the reasonably understood terms of the order." *Id.* (quoting *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578 (5th Cir. 2000)).

Here, it is clear that the TRO was intended to prohibit Dores from contact with any current or former suppliers or customers of Bunnett and EFI for the purpose of assisting with distribution or sale of product.  R. Gearheart attempts to limit the TRO to only customers and suppliers who were, at the time of the TRO, doing business with Bunnett or EFI.  He argues that because Wawasan, as of January 13, 2016, was not a current supplier of Bunnett or EFI, Dores was free to accept payments from it.  This reading ignores the existing circumstances when the TRO was agreed to.  To place the TRO in context, Bunnett and EFI sued Dores because they believed he had faked an illness and taken sick leave, and then, while on leave, created a new corporation through which he intended to purchase supplements from Wawasan and resell them himself to the very same entities

that Bunnett and EFI sold to when Dores was their general manager, cutting Bunnett and EFI out of the transactions entirely. To suggest that Wawasan was not one of the "suppliers" to which the TRO applied denies the reality of what the dispute was about. Moreover, the parties themselves clearly believed the TRO encompassed Wawasan, as there is no other explanation for why it was served on Cheong, and why the parties went through the elaborate machinations described above to hide a payment from Wawasan to Dores. The argument that Wawasan was not a "supplier" of Bunnett encompassed by the TRO is inconsistent with the language of the TRO, and is not in accord with the facts of this case, or the understanding of the parties.

Similarly, the Gearhearts' reading of the phrase "soliciting . . . for the purpose of creating a contractual or other business relationship" is overly narrow. First, their attempt to limit "other business relationship" as requiring that the discussions be about creating a new legal entity is nonsensical. The plain language of the TRO, which uses the phrase "contractual *or* other business relationship," indicates that engaging in something *less* than a contractual relationship was prohibited. Thus, Dores was not allowed to have any contact with parties with whom he had previously worked in the purchase of feed supplement ingredients, or in the sale or distribution of these products, if those conversations involved any sort of "business relationship" between Dores and that party. This is further supported by the fact that the TRO included specific language Dores was required to use to respond to any person in this category who contacted him.

Second, the narrow reading of "creating" does not fit with the other phrases of the TRO. T. and R. Gearheart argue that the inclusion of the term "creating" in the phrase means the prohibition only prevented Dores from forming a new relationship during the TRO term. Yet, the TRO also specifically refers to"customer[s] or supplier[s] of Plaintiffs with whom Dores had contact or for

whom he performed services during his employment with Plaintiffs." Thus, by its terms, the TRO is plainly addressing contact with parties with whom Dores previously had a "business relationship," and did not solely prohibit him from starting a new relationship. "Creating" was needed because at the time the TRO was entered, Dores had quit his position with Bunnett and EFI, and thus any future relationship he might have with former customers or suppliers of Bunnett or EFI would be a newly created business relationship between those parties and either Dores himself (through his new corporation FM Ag), or some new employer of Dores (*e.g.,* Agrofin). The clear meaning of the order read as a whole in the context of the litigation and the pending motion for a temporary restraining order, was to prohibit Dores from having contact with the customers or suppliers of Bunnett and EFI with whom he had dealt while employed by Bunnett and EFI, for the purpose of selling or distributing product—regardless of the customer or supplier's current status with Bunnett.

### 3.    Failure to Comply

As discussed previously, Bunnett and EFI contend that T. and R. Gearheart violated the January TRO when they worked with Gareth Cheong and Wawasan to transfer $20,000 to Dores in a hidden fashion on January 26, 2016, and again on March 28, 2016. This requires proof that they either participated, or acted in active concert, with Dores in violating the TRO at the time it was in place. *Waffenschmidt*, 763 F.2d at 726. Again, the Court will break these elements down, and examine the evidence as to each.

### a.    Active Concert or Participation

The evidence clearly demonstrated that both Gearhearts were working in active concert with Dores with regard to the payments from Wawasan. Dores requested the money from Wawasan and supplied R. Gearheart with the names and addresses of the intermediaries he was to use to hide the

transfers. T. Gearheart then acted in concert with R. Gearheart and Dores to both receive the initial payment from Wawasan, and then transfer the money to the intermediaries. T. Gearheart's argument that he was acting in concert with Wawasan and R. Gearheart, not Dores, is a red herring. T. Gearheart acted in concert with R. Gearheart and Cheong, who in turn acted with Dores to evade the terms of the TRO. The fact that T. Gearheart never had any direct communication with Dores is irrelevant. The evidence clearly showed that he knew the ultimate beneficiary of his actions was Dores. Moreover, T. Gearheart sent the payments to people he knew to be family members or friends of Dores. As such, there is clear evidence that Dores and T. and R. Gearheart acted in concert or participation in the actions at issue in this proceeding.

### b. Violated the Terms

The evidence also shows that Dores, R. Gearheart, and T. Gearheart violated the terms of the January TRO. First, it is important to note that none of the alleged contemnors dispute that Wawasan sent Dores $40,000, and routed the money through T. Gearheart and several of Dores' family members. The money was sent in two payments—one on January 26, 2016, and one on March 28, 2016. Pl. Exh. 11. The parties all further acknowledge that each of the two payments was broken up into smaller sums paid to Dores' family members. This much is not in dispute.

What is disputed is why the $40,000 was paid to Dores. The contemnors allege that Cheong and Wawasan made the payments as a charitable gesture to provide Dores some financial relief in the wake of his pending bankruptcy and increasing litigation costs. T. and R. Gearheart were therefore, according to the Contemnors, merely assisting a potential business partner, Wawasan, in providing financial assistance to a former business associate, and that such a "gift" did not violate the TRO. Bunnett and EFI, on the other hand, offer a different narrative. They argue that Wawasan

sent the payments to Dores for one of two reasons, either of which would violate the terms of the TRO: (1) as a sort of non-compete or goodwill payment to retain his loyalty while he got himself set up to replace Bunnett and EFI as Wawasan's U.S. distributor; or (2) as payment for services rendered in pointing former Bunnett customers to Agrofin, the new distributor Wawasan eventually organized.

With regard to the Gearhearts' claim that the payment was a gift, it is abundantly clear from the evidence that the payment was not a charitable donation. First, R. Gearheart and T. Gearheart both deny that they were friends with Dores. Vol. 1 Tr. 189:6–12; Vol. 2 Tr. 91:12–14. Dores admits that the only gift he had received previously from Wawasan was a box of chocolates for Christmas. Vol. 1 Tr. 123:16–18. Rather, the three were all business associates of Dores, and he had little, if any, personal interactions with any of them outside this sphere. *See* Cheong Dep. 26:25–27:16, 30:12–33:14 (discussing the limited interactions with Dores in the nearly ten years they had known each other). Moreover, when asked at a deposition about Wawasan's previous charitable giving habits, Cheong admitted that the payment to Dores was the largest donation Wawasan had ever given. *Id.* 194:20–195:10. The next closest was a donation to a school in the amount of $7,500. *Id.*[9] Thus, the claim that the $40,000 paid to Dores was a gift is not believable. Cheong also admitted that, due to the pending litigation, the transaction was structured so that the payments would look "different" coming from T. Gearheart. Cheong Dep. 187:18–23. All of these facts taken together make it clear that the payments were not made for charitable reasons.

---

[9]The donation was for the sum of 30,000 ringgit. The current exchange rate for ringgit to U.S. dollar is 4:1. Thus a 30,000 ringgit donation would (today) equal about US $7,500.

In their briefing, R. and T. Gearheart make the alternative argument that the mere payment of funds to Dores cannot constitute contempt as neither of them did anything to aid or abet Dores in soliciting a business relationship prohibited by the TRO. *See* Dkt No. 209 at 28; Dkt. No. 210 at 27-28. R. Gearheart compares this situation to that of the parties in *Travelhost*. In that case, the Fifth Circuit found that the non-parties had not violated an injunction that prohibited the defendant from continuing to run a publication. 68 F.3d at 965. The court noted that the complained of sale of the publication was an arms-length transaction, and that the plaintiffs had failed to produce any evidence that the defendant was working together with the non-parties to continue to publish. *Id.* Likewise, R. Gearheart contends that Bunnett cannot prove that the parties violated the TRO simply by showing that he and his son transferred money to Dores. However, it is clear from the evidence that each of the contemnors participated in this transaction for the purpose of evading this Court's order. As noted above, the payments clearly were not made as a gift. The efforts to conceal the payments also demonstrates a guilty knowledge that they were acting improperly.

Moreover, and to the point the Gearhearts raise, the evidence shows that Wawasan was sending the payments to Dores in exchange for services he rendered in violation of the TRO. To begin, the evidence points clearly to an attempt to evade the Court's order. The parties all concede that the tortured payment structure was used because Dores had informed them that he could not receive the money directly. Cheong Dep. 182:01-03; Vol. 2 Tr. 34:12-17; *Id.* 134:3-5. The backhand method of getting the money to Dores is by itself evidence that the contemnors were acting to evade the court's order. *See Waffenschmidt*, 763 F.2d at 724–25 (describing the contemnors' handling of the T-Note and dissipation of the proceeds at issue as evidence of contempt). Further, Dores was already trying to hide his continued relationship with Wawasan in the fall of 2015, as the

$20,000 Wawasan paid him in November was not paid directly to Dores, but instead through "his wife's" company, FM Ag, and was supported by a fake invoice for a "research study" that was never performed, nor intended to be performed.  *See* Wei Su Dep. 11/1/16 69:24–70:07; Cheong Dep. 92:09–22.

Additionally, Wei Su's and Cheong's testimony regarding Dores' role with Agrofin and Wawasan in November further supports this inference.  In her first deposition in November 2016, Wei Su testified that Dores was intended to be an independent sales agent for Agrofin.  Wei Su Dep. 11/1/16 38:16–24.  Cheong had introduced Dores to Wei Su, along with the other independent sales agents, R. Gearheart and John Franklin, none of whom she had met previously.  *Id.* 38:21–39:09; Wei Su Dep. 6/27/17 44:05-08.  Wei Su later changed her testimony, stating that Dores had been sending customers to Agrofin, but she did not know why he was doing it.  Wei Su Dep. 6/27/17 54:14–25, 55:04–07, 59:18–20.  When she was confronted with her prior testimony at the second deposition, she claimed a lapse in memory, and could not answer for certain which was the correct version of events.  *Id.* 139:25–141:11.  Much of Wei Su's testimony is not credible, and this change of her story and lapse of memory is another example.  Cheong offered a slightly different reason for the November payment.  He claimed that the payment was intended as a sort of goodwill payment to discourage Dores from going to work for any Wawasan competitors, but this is rebutted by the fact that Dores began sending customers to Wawasan or Agrofin  almost immediately after leaving Bunnett and EFI.  *Compare* Cheong Dep. 46:19-23 (testifying that the payment was made to keep Dores from working for a competitor, and claiming no knowledge that Dores was providing referrals to Agrofin) *with id.* 45:17-21 (admitting that Dores worked to promote Wawasan products in November 2015).  *See also* Wei Su Dep. 11/1/16 38:21–39:09 (testifying that Cheong introduced

Dores to Wei Su); Vol. 1 Tr. 107:24-108:4 (Dores testifying that he believed the payments were to keep him from joining a competitor).

Of the three competing stories, the first one told by Wei Su is the one that is most supported by the evidence. The record contains a number of emails from Wei Su to potential Wawasan customers, on which Dores was copied, and which stated that Dores had given her the customers' information. *See, e.g.*, Pl. Exhs. 33, 35, 38–40; Wei Su Dep. 6/27/17 91:02–09. This clearly supports Wei Su's initial story that Dores was working at the time as an independent sales agent for Agrofin. Though Dores argued, rather forcefully, that he did not "assist" any former customers, the evidence clearly indicates otherwise. *Cf.* Vol. 1 Tr. 78:1–8 ("Not assisted. Referred."). This evidence shows that Dores was providing business referrals to Wawasan in November 2015, and was paid $20,000 for that same month, which supports the inference that the $20,000 payments made in January and March were also made to compensate Dores for his continued work as a sales agent for Wawasan and Agrofin. *See Am. Airlines*, 228 F.3d at 583 (finding that communications sent prior to the entry of the TRO were evidence supporting a finding that communications made after entry of the TRO did not comply).

And there is evidence that Dores was continuing to assist former Bunnett customers in January 2016. In an email from from R. Gearheart to KoreChem, Inc. in January, R. Gearheart states that he, "Frank Dores and John Franklin" were interested in working with KoreChem. Pl. Exh. 54. The email specifically notes that "[w]e have warehouses . . . for Palm product distribution" and asks if "*we* should be working with Kore[Chem]?" *Id.* (emphasis added). When asked about this email at the hearing, R. Gearheart first stated that he made a mistake with the verb tense in the email and that he was not working with Dores at that time. Vol. 2 Tr. 106:22–107:11. However, he also

24

offered the competing story that he may have just been "trying to impress Mr. Schabel by telling him something that wasn't true." *Id.* 107:20–24. Like much of the contemnors' testimony, the Court does not find this testimony credible. This email indicates that on January 5, Dores was working with R. Gearheart and Franklin to continue in the feed business.

Similarly, there was another email exchange from March in which Cheong and R. Gearheart discuss Dores' advice on selling directly to dairies, indicating that Dores was still communicating with Cheong regarding distribution of Wawasan supplements. Pl. Exh. 67; Cheong Dep. 37:05–16, 37:19–39:03. Added to this is the admission by Cheong that communications between the two mainly occurred over the phone, as opposed to email. *See* Cheong Dep. 177:09–11. This provides additional evidence that Dores continued to provide support to Wawasan during the early spring of 2016. Pl. Exh. 71 (R. Gearheart stating:"I know Frank has really supported this, but Im [sic] not sure he sees the big picture." ).

Of course, the TRO precluding Dores from working in the agricultural industry was not in place on January 5 or in March. Rather, its term was from January 13 to February 1, 2016. The record does not contain any direct evidence of actual sales made by Dores during this period. In fact, there appear to be no communications for this time period from Dores; though, the Court knows that, at the very least, he answered a phone call from R. Gearheart in order to give him the information on where to send the payments. Vol. 2 Tr. 127:17–25.[10] However, direct evidence of sales by Dores

---

[10]Dores already has demonstrated a history of destroying evidence. Just days before Dores left Bunnett, he updated the operating system of his work laptop, which had the effect of making it impossible to see if he had deleted files or transferred files off the computer, and a forensic examiner concluded that "all files created in the five years between the first use of the computer . . . and the upgrade . . . must have been deleted from the laptop prior to the upgrade." *See* Dkt. No. 22-2 at 23, 24. He also reset his work iPad to factory settings, wiping all of the user data off of that device. Thus, the record's lack of any direct communications between Dores and his former customers

is not required to find that the parties violated the TRO. Rather, the evidence must show that the payments were made in compensation for Dores soliciting parties on behalf of Wawasan to create a business relationship with them. These events in early January and March suggest exactly that.

In addition to the strong inference created by the two communications in January and March, there are also a number of other facts which support the conclusion that Wawasan paid Dores for his work as an independent sales agent. First is the fact that R. Gearheart was paid $20,000 monthly for his work as a sales agent. Cheong Dep. 43:05–16; Pl. Exh. 12. The same $20,000 per month figure is also the amount that Dores requested from Wawasan to become the General Manager. Cheong Dep. 42:17–20. Though Cheong stated that he did not hire Dores, in November, January, and March, Wawasan sent payments for that exact amount to Dores. *See* Cheong Dep.41:23–42:22. Similarly, the parties were clearly trying to avoid discovery of the payments by sending them surreptitiously. R. Gearheart testified that Cheong "was concerned that the payments from Wawasan to Frank Dores would be construed as a pay-off." Vol. 2 Tr. 134:11–14. He further expressed doubt that the payment was made as a charitable donation. *Id.* 204:2–9 ("[T]here was always a little doubt of what was—what was happening here or what was going on."). Cheong additionally testified that he originally intended to have T. Gearheart make the payments to Dores, and then reimburse him, because he believed the payments might look less suspicious coming from T. Gearheart. Cheong Dep. 187:20–23 (stating: "I mean, if—if Todd has donated to Frank and then he's claiming back from Wawasan, I think it looks—I think it—to me, it looks like a different perspective.").

---

during the pendency of the TRO is as likely the result of Dores hiding evidence of those communications, as it is because no such communications occurred.

Additionally, Cheong's claim that the purpose of the November payment was different from the purposes for those made in January and March was unpersuasive. In his deposition, he testified that he paid Dores $20,000 in November because he was worried about Dores going to work for a competitor, but also admitted that he no longer had that fear when he paid Dores the exact same amount in January. Cheong Dep. 195:21–196:09. It is not credible that the payment in November was made for work-related purposes, while the two $20,000 payments made two months later were purely charitable. As noted above, it is clear that the payments were not made to simply help out a friend, especially given the lukewarm, at best, relationship that Cheong and the Gearhearts had with Dores. *See* Cheong Dep. 26:25–27:16, 30:12–33:14 (stating that he had met Dores' wife and daughters once at a conference and that Dores had met his wife, also on a company trip); Vol. 1 Tr. 189:6–12; Vol. 2 Tr. 91:12–14. It strains credulity that the November, January, and March payments were for different purposes. The Court can infer from the evidence described above that Wawasan's $20,000 payments to Dores in January and March were intended as payments for services Dores had provided to Wawasan. Viewing the evidentiary record as a whole, and taking into account the lack of credibility of the respondents, the Court concludes that there is clear and convincing evidence that Wawasan made the two transfers of $20,000 in compensation for Dores' work to solicit Bunnett and EFI customers and suppliers with whom Dores had contact while he worked for Bunnett and EFI, for the purpose of creating a business relationship with them.

### c. During the Pendency of the TRO

T. and R. Gearheart assert that they cannot be held in contempt for the March 28 payment since it was well outside the scope of the January TRO. In response, Bunnett points to evidence showing that the two payments were originally meant to be a single $40,000 payment to be paid in

January. *See* Pl. Exh. 64 at 2; Pl. Exh. 57. As already described, the emails indicate that Cheong decided that such a large payment would be a red flag, and decided to separate the payments into two $20,000 sums, to be divided into even smaller amounts sent to Dores' family members before ultimately reaching Dores. RG Exh. 19. Thus, though Bunnett and EFI are correct that Wawasan originally intended to send the entire $40,000 during the pendency of the TRO—and even made this decision while the TRO was in effect—the Court concludes that his not enough evidence on which to find that the March payment violated the TRO. The Court therefore agrees that the March 28 payment did not violate the January TRO.[11]

On the other hand, the January 26 payment clearly violated the January TRO. The payment was made during the January 13 to February 1, 2016 time period, and, as already found, was compensation to Dores for work prohibited by the TRO. T. Gearheart makes a specious argument that the plan to send the first $20,000 was already in place before the TRO was entered, and so that payment cannot provide a basis for contempt. Regardless of when the decision to make the payment was made, the transfer took place on January 26, which is clearly within the relevant time period. *See* Pl. Exh. 65 (showing email between R. and T. Gearheart confirming the transfer); Pl. Ex. 11 (showing a $20,000 deposit and checks in the amounts of $15,000 and $5,000 on January 26, 2016). What matters is not when decisions were made, but rather when affirmative acts were taken. Further, though T. Gearheart had agreed to participate in the scheme prior to the entry of the TRO (Pl. Exh. 57), there were more communications in furtherance of the scheme that took place after the

---

[11] If the standard was "a preponderance of the evidence" the result might have been different. The January invoice ("8551") was for the full amount of $40,000. The invoice for March reads: "Being payment for balance 50% of invoice 8551 dated 15 January 2016 for services rendered." Thus, the March payment is tied closely to the January payment, and the fake invoice for the full $40,000 was sent during the time the TRO was in place.

TRO was in effect. In fact, the determination to send $20,000 rather than $40,000 occurred after January 13. Pl. Exh. 62; RG Exh. 19 (email between T. Gearheart and Cheong on January 22 confirming that "payment will come in two tranches"). Similarly, the sham invoice (for $40,000) that T. Gearheart provided was dated January 15, 2016 (Pl. Exh. 64 at 2), and Wawasan's payment voucher (for half of the above invoice) was dated January 25, 2016 (Pl. Exh. 64 at 3), all within the TRO time frame. *See also* RG Exh. 20 (email between R. and T. Gearheart on January 14 regarding the invoice). The transfers of funds from Wawasan to T. Gearheart, and from T. Gearheart to Dores' family members, were all made during the term of the TRO, and this is sufficient to demonstrate that the contemnors' acts in violation of the TRO took place during the pendency of the TRO.

### d.     Conclusion

For the reasons set forth above, the Court finds by clear and convincing evidence that Dores violated the January TRO when he accepted payment from Wawasan for his assistance to Agrofin and Wawasan, and when he worked with the Gearhearts to funnel the money from Wawasan to his family members, and the Court also finds that the Gearhearts acted in concert with Dores to facilitate those payments, knowing they were prohibited by the TRO.[12]

## C.     Remedy

"Judicial sanctions in civil contempt proceedings, may in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *American Airlines, Inc. v. Allied Pilots Ass'n,*

---

[12] T. and R. Gearheart—rather amazingly, given the evidence—argue that they acted in good faith, and therefore should not be held in contempt. Good faith, however, is not a defense to civil contempt. *Waffenschmidt*, 763 F.2d at 726. Moreover, the evidence strongly demonstrates that both the Gearhearts acted with full knowledge of the circumstances, and not only did they not act in good faith, it could be argued that acted with affirmative *bad* faith. This argument fails.

228 F.3d 574, 585 (5th Cir. 2000) (quoting *United States v. United Mine Workers of America*, 330 U.S. 258, 303–04 (1947)); *see also Travelhost*, 68 F.3d at 961–62. A court "has broad discretion in the assessment of damages in a civil contempt proceeding." *American Airlines*, 228 F.3d at 585 (quoting *Long Island Rail Co. v. Bhd. of Rail. Trainmen*, 298 F. Supp. 1347, 1347 (E.D.N.Y. 1969)). "The purpose is to compensate for the damages sustained." *Id.* Here, Bunnett asks for disgorgement of the two $20,000 payments to Dores and for reasonable attorney's fees and costs.

### 1.    Disgorgement

The Plaintiffs first ask for disgorgement of the two payments sent to Dores in January and March 2016. T. and R. Gearheart argue that disgorgement is not the appropriate remedy in this case, and contend that they cannot be ordered to disgorge the payments as they were not given this money. Bunnett responds that disgorgement is permitted in civil contempt cases, and further that the Gearharts can be held jointly and severally liable with Dores.

R. Gearheart first contends that disgorgement should never be an appropriate remedy in civil contempt. Dkt. No. 210 at 42–44. In support, he points to *S.E.C. v. Huffman*, 996 F.2d 800, 802 (5th Cir. 1993) for the principle that disgorgement is a remedy meant to prevent unjust enrichment of the defendant. This, he argues, means that the remedy is inappropriate in civil contempt where the only purpose is to either compensate the complainant or coerce the contemnor into compliance. Dkt. No. 210 at 42–43. However, courts *have* found that disgorgement is an appropriate remedy in civil contempt cases. *See, e.g.*, *FTC v. Leshin*, 618 F.3d 1221, 1237 (11th Cir. 2010) ("We afford the district court wide discretion in fashioning an equitable remedy in civil contempt, which includes

ordering disgorgement . . . .").[13] Thus, the proper question is whether disgorgement is appropriate in this case.

Here, the Court finds that disgorgement is an appropriate remedy. Courts have "broad discretion" in fashioning an appropriate remedy for civil contempt. *American Airlines*, 228 F.3d at 585. R. and T. Gearheart argue that they should not be required to disgorge the $20,000 because they never received the money, but merely transferred it to Dores. However, parties that "join together to evade a judgment, . . . become jointly and severally liable for the amount of damages resulting from the contumacious conduct." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 53 F. Supp. 2d 909, 942 (N.D. Tex. 1999) (quoting *N.L.R.B. v. Laborers' Int'l Union of N.A., AFL—CIO*, 882 F.2d 949, 955 (5th Cir. 1999)). Because the Court has found that R. and T. Gearheart acted in concert with Dores to violate the Court's order, they may be held jointly and severally liable with him for the damages, in this case $20,000.

### 2.    Attorney's Fees

Finally, Bunnett requests its reasonable attorney's fees and costs. As this Court has found that Dores and the Gearhearts should be held in contempt for violating the January TRO, the Court may also award the movants' reasonable attorney's fees and costs. *See Waffenschmidt*, 763 F.2d at 726–27 (citing *F.D. Rich Co., Inc. v. United States ex rel Industrial Lumber Co., Inc.*, 417 U.S. 116, 129 (1974)) ("Based on the evidence discussed in the previous sections, the court had ample evidence to conclude that Currey and Johnson aided and abetted MacKay in violating the court's injunction. This vexatious conduct justified the award of attorney's fees against them."). As Bunnett

---

[13] *See also Bd. of Supervisors of the La. State Univ. v. Smack Apparel*, 574 F. Supp. 2d 601, 606 (E.D. La. 2008); *Buffalo Wings Factory, Inc. v. Mohd*, 574 F. Supp. 2d 574, 581–82 (E.D. Va. 2008); *Manhattan Inds., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1 (2d Cir. 1989).

has not submitted its request and documentation of its reasonable attorney's fees and costs, the Court **RECOMMENDS** that the District Court **REFER** determination of the matter to this Court following adoption of the Report and Recommendation.[14]

## III. RECOMMENDATIONS

This undersigned **RECOMMENDS** that the District Court **GRANT IN PART** and **DENY IN PART** Plaintiffs' Amended Motion for Order to Show Cause (Dkt. No. 179) . In particular, the Court **RECOMMENDS** that the District Court **FIND** Frank Dores, Ray Gearheart, and Todd Gearheart in contempt of this Court's January 13, 2016 Temporary Restraining Order (Dkt. No. 47). The undersigned **FURTHER RECOMMENDS** that the District Court **HOLD** Frank Dores, Ray Gearheart, and Todd Gearheart jointly and severally liable for damages in the amount of $20,000.00 and Plaintiffs' reasonable attorney's fees and costs, and **DENY** all further relief requested.

The undersigned **FURTHER RECOMMENDS** that following the District Court's adoption of this Report and Recommendation, this case be **REFERRED** back to the undersigned for resolution on the issue of attorney's fees and costs. Finally, the undersigned **RECOMMENDS** that the District Court **GRANT** the Joint Motion to Dismiss Voluntarily with Prejudice (Dkt. No. 190), and **DISMISS WITH PREJUDICE** Plaintiffs' claims in the Amended Motion for Order to Show Cause (Dkt. No. 190) made against Wawasan and Gareth Cheong based on those parties' settlement of those issues.

---

[14]Though nothing has changed since the Court ruled on this issue, in his briefing T. Gearheart reasserted his argument that the Court does not have jurisdiction over him. For the reasons already expressed in a previous ruling, the Court rejects this argument. *See* Dkt. No. 109, adopted by Dkt. No. 114.

# IV. WARNINGS

The parties may file objections to the Recommendations contained above. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150–53, 106 S. Ct. 466, 472-74 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

SIGNED this 6th day of March, 2018.

_____

ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE